28 A.3d 1261

**INDIAN ROCKS PROPERTY OWNERS ASSOCIATION, INC. OF LEDGEDALE, Appellant**

v.

**John P. GLATFELTER and Regina L. Glatfelter, His Wife, Appellees.**

Supreme Court of Pennsylvania.

Argued May 13, 2009.

Re–Submitted Nov. 22, 2010.

Decided Sept. 29, 2011.

562

Ronald M. Bugaj, Ronnie Jennifer Fischer, Bugaj/Fischer, Honesdale, for Indian Rocks Property Owners Association, Inc., of Ledgedale.

Jeffrey Stephen Treat, Honesdale, for John and Regina Glatfelter.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, ORIE MELVIN, JJ.

### OPINION ANNOUNCING THE JUDGMENT OF THE COURT

Justice EAKIN.

Indian Rocks Property Owners Association, Inc. of Ledgedale originated in 1955 as the governing body of a development located in Salem Township, Wayne County, Pennsylvania. The development consists of 546 acres, and its purpose is " 'to develop adjacent lakeside land into a miniature community for vacation, recreation and retirement.' " *Indian Rocks Property Owners Association, Inc. of Ledgedale v. Glatfelter*, 950 A.2d 1093, 1095 (Pa.Cmwlth.2008) (quoting Association's Official Handbook). The Association developed rules and regulations, which are recorded as protective covenants running with the land. Article VIII, § 1 of the Covenants

provides all " 'building, excavation, exterior remodeling or altering of any structure, wall or fence shall [not] be commenced without obtaining written approval of the Developer ... as to the location, elevation, set back from property lines, construction materials, quality of workm[a]nship and harmony of external design with existing structures.' " *Id.*

In 1980, John P. Glatfelter and his wife, Regina L. Glatfelter, purchased a lot within the community; John Glatfelter died in 1990, leaving Regina Glatfelter the sole owner. The lot sat vacant until the fall of 2003 when son David Glatfelter began constructing a foundation. The Association initially inspected and approved the excavation, but in December, 2003 informed the Glatfelters the work was substandard and inadequate pursuant to the Covenants. The Glatfelters were ordered to cease construction until a new construction plan was approved.

In April, 2004, the Association filed an equity action alleging the Glatfelters violated the Pennsylvania Construction Code Act, 35 P.S. § 7210.101 *et seq.*, which the Association incorporated into the Covenants by resolution on April 24, 2004. The Association sought an order directing the Glatfelters to comply with the Covenants and to cease work until approval was obtained from the architectural committee. On April 30, 2004, the Glatfelters agreed to stop work until they submitted a new application for construction in conformance with the Covenants, but they failed to comply with the agreement; trial on the equity action was scheduled for July 26, 2005. At trial, the parties entered a stipulation; the Glatfelters agreed to file an application for construction within 60 days, prepare an outline to comply with the Covenants and Construction Code, and hire an engineer to monitor construction. In exchange, the Association waived all past fees and fines. The trial court approved the stipulation and entered it as an order. The Glatfelters again failed to fulfill their obligations pursuant to the stipulation, and the Association filed a petition for civil contempt.

Between the commencement of the equity action in April, 2004 and the July, 2005 trial, Act 92 of 2004 amended the

Construction Code to exempt "recreational cabins" from its requirements so long as:

(i) the cabin is equipped with at least one smoke detector, one fire extinguisher and one carbon monoxide detector in both the kitchen and sleeping quarters; [and]

(ii) the owner of the cabin files with the municipality either

(A) an affidavit on a form prescribed by the department attesting to the fact that the cabin meets the definition of a "recreational cabin" in section 103; or

(B) a valid proof of insurance for the recreational cabin, written and issued by an insurer authorized to do business in this Commonwealth, stating that the structure meets the definition of a "recreational cabin" as defined in section 103.

35 P.S. § 7210.104(b)(7). A "recreational cabin" is defined as a structure:

(1) utilized principally for recreational activity;

(2) not utilized as a domicile or residence for any individual for any time period;

(3) not utilized for commercial purposes;

(4) not greater than two stories in height, excluding basement;

(5) not utilized by the owner or any other person as a place of employment;

(6) not a mailing address for bills and correspondence; and

(7) not listed as an individual's place of residence on a tax return, driver's license, car registration or voter registration.

*Id.,* § 7210.103. Despite adopting the Construction Code the prior year, the Association passed a resolution in April, 2005 refusing to recognize the recreational cabin exemption.

The Glatfelters relied upon the recreational cabin exemption when they responded to the Association's petition for contempt and argued they were exempt from the Construction Code and the Covenants. On December 26, 2005, the Glatfelters submitted a building permit issued by Salem Township

for construction of a " 'two-story vacation home, slab on grade: stick built (recreational cabin exempt).' " *Indian Rocks,* at 1097 (quoting Salem Township Permit). Attached to the permit was a "Recreational Cabin Affidavit"[1] in which the Glatfelters stated the proposed structure met the requirements of the Construction Code's recreational cabin exemption.

The trial court heard argument on the Association's civil contempt petition on April 12, 2006. At that time, the parties stipulated the issue for determination was " '[w]hether or not the provisions of a recreational cabin exclusion [are] applicable in this case and/or whether or not a recreational cabin as defined by the Uniform [Construction] Code creates an exemption which is binding upon the Townships as well as Property Owners Associations.' " *Id.* (quoting Stipulation, at ¶ 23). While the trial court agreed the Glatfelters met the recreational cabin exemption, it held the exemption did not apply because the Glatfelters agreed to comply with the Association's requirements as they existed at the time of the April 30, 2004 agreement. Regarding contempt, the trial court found the Glatfelters did not willfully violate the court's order and permitted an additional 90 days to comply. After the Glatfelters failed to do so, the Association filed another contempt petition, which the trial court granted.

The Glatfelters timely appealed the contempt order to the Commonwealth Court. The Commonwealth Court reversed the trial court's order, holding the Glatfelters did not waive their ability to raise the recreational cabin exemption by virtue of the April, 2004 and July, 2005 agreements. *Id.,* at 1100. The court noted the Construction Code unambiguously preempts the field of construction regulation. Therefore, since neither of the agreements specifically referred to the "recreational cabin" exemption, the Glatfelters did not waive the ability to invoke the exemption. The Commonwealth Court did not address whether the purported use satisfied the definition of "recreational activity," as the only issues before it were "whether the recreational cabin exclusion applies . . . and

---

1. Department of Labor and Industry Form UCC–13.

whether the Township and the Association are bound by the exclusion." *Id.*, at 1100 n. 4.

The Association appealed, and we granted allocatur limited to the following issue: "[w]hether the term 'recreational activity,' as contained in the Construction Code, 35 P.S. § 7210.103, is ambiguous, necessitating that this Court apply the rules of statutory construction to ascertain the intent of the Legislature?" *Indian Rocks Property Owners Association, Inc. of Ledgedale v. Glatfelter,* 600 Pa. 98, 963 A.2d 902, 902–03 (2008). We later expanded our scope of review and requested supplemental briefing from the parties on the following issues:

> Are appellees entitled to build a "recreational cabin," as defined in 35 P.S. § 7210.103, in the secondary home planned community of Indian Rocks, which had adopted the Pennsylvania Construction Code Act, 35 P.S. § 7210.101 *et seq.?*

> Are appellees estopped by the agreement with appellant in July of 2005 from building a "recreational cabin" in the secondary home planned community of Indian Rocks?

Per Curiam Order, 12/30/10. As our disposition of the third issue will determine whether the other issues need to be addressed, we will discuss it first.

The Association argues the Glatfelters are estopped from building a recreational cabin under the doctrines of equitable estoppel, promissory estoppel, and estoppel by judicial admission or stipulation. It notes in the July, 2005 Stipulation, the Glatfelters agreed to submit an application with the Association describing the intended construction, to conform with the Association's rules and regulations then in effect, and to hire an engineer to monitor construction. The Association contends, based upon these assurances, it agreed to end the proceedings and not seek the fines and penalties it levied against the Glatfelters. The Association also suggests the Glatfelters have impliedly waived the recreational cabin exemption by agreeing to abide by the Association's rules and regulations, which at the time of the agreement specifically refused to adopt the recreational cabin exemption. Pursuant

to these various legal doctrines, the Association concludes it would be unfair for the Glatfelters to circumvent its rules and regulations by claiming a recreational cabin exemption when they agreed to abide by the rules and regulations.

The Glatfelters argue the Association's resolution refusing to recognize the recreational cabin exemption is unenforceable because the Construction Code specifically preempts home-owners' association rules and regulations. They cite § 7210.104(d)(2)(i) of the Construction Code, which provides "a homeowners' association or community association shall be preempted from imposing building construction standards or building codes for buildings to be constructed, renovated, altered or modified." 35 P.S. § 7210.104(d)(2)(i).[2] Thus, they contend, they cannot be estopped from building a recreational cabin because the Association's rules and regulations are in direct contravention of state law.

■ Resolution of this issue requires us to interpret the breadth of the Construction Code's preemption clause; specifically, we must determine the meaning of the phrase "building construction standards or building codes." Because statutory interpretation is a question of law, our standard of review is *de novo*, and our scope of review is plenary. *See In re Milton Hershey School*, 590 Pa. 35, 911 A.2d 1258, 1261 (2006) (citation omitted). "The object of all interpretation and construction of statutes is to ascertain and effectuate the intention of the General Assembly." 1 Pa.C.S. § 1921. When interpreting statutes, "[w]ords and phrases shall be construed according to the rules of grammar and according to their common and approved usage." *Id.*, § 1903. If the words of a statute are unambiguous, we are required to interpret the statute in

---

**2.** Section 7210.301(d)(1) of the Construction Code similarly states:

The regulations adopted by the department implementing these codes shall supersede and preempt all local building codes regulating any aspect of construction, alteration and repair of buildings adopted or enforced by any municipality or authority or pursuant to any deed restriction, rule, regulation, ordinance, resolution, tariff or order of any public utility or any State or local board, agency, commission or homeowners' association except as may be otherwise specifically provided in this act.

35 P.S. § 7210.301(d)(1).

accordance with the plain meaning of the words. *Id.*, § 1921(b).

The Glatfelters suggest because the Construction Code provides for a recreational cabin exemption and the Construction Code preempts homeowners' associations' rules and regulations, a homeowners' association cannot prevent a landowner from building a recreational cabin. Such an interpretation requires a very broad reading of the phrase "building code standards or building codes" found in the preemption clause. The Construction Code does not define "building code standards" or "building codes"; therefore, we look to the intent of the General Assembly in enacting the Construction Code and the ordinary meaning of the relevant phrases.

■ The Construction Code's purpose is to "provide standards for the protection of life, health, property and environment and for the safety and welfare of the consumer, general public and the owners and occupants of buildings and structures." 35 P.S. § 7210.102(b)(1). With that purpose in mind, we understand "building code standards or building codes" to refer to the materials, manner, and methods of construction— the nuts and bolts so to speak—which ensure a structure's safety. For example, the Construction Code specifies the depth of a stair tread, 34 Pa.Code § 403.21(6)(ii), and whether smoke alarms should be interconnected. *Id.*, § 403.21(6)(i).

■ Indeed, the Construction Code is voluminous and covers nearly every component of a structure. What it does not cover, however, are the more aesthetic features of a building. The Construction Code does not say whether you can have blue shutters on a green exterior or whether you are permitted to install a satellite dish on your roof. Therefore, while a homeowners' association is preempted from establishing codes related to stair treads, it is not preempted from enforcing more subjective requirements, such as a proposed structure's harmony with other structures. To hold that the Legislature intended to preempt *all* homeowners' associations' rules and regulations would lead to the absurd result of disbanding all homeowners' associations in the Commonwealth—a result we must presume the Legislature did not intend. *See* 1 Pa.C.S.

§ 1922(1) (General Assembly does not intend result that is absurd, impossible of execution, or unreasonable).

■ Turning to the stipulation entered between the parties, the Glatfelters agreed to abide by the Association's rules and regulations. Chief among those rules and regulations is Article VIII, § 1 of the Covenants, which provides all " 'building, excavation, exterior remodeling or altering of any structure, wall or fence shall [not] be commenced without obtaining written approval of the Developer . . . as to the location, elevation, set back from property lines, construction materials, quality of workm[a]nship and harmony of external design with existing structures.' " *Indian Rocks,* at 1095 (quoting Association's Official Handbook). In other words, the Association has broad discretion in determining what can or cannot be built within its community, and, for better or worse, the Glatfelters agreed to obtain approval from the Association regarding their intended structure. The Glatfelters cannot use the recreational cabin exemption as a trump card to bypass the rules and regulations to which they agreed. As stated above, the Construction Code could preempt the Association's regulations relating to construction materials and processes, but it does not preempt the Association's ability to refuse a structure for other reasons, including the harmony with other structures and, to some degree, the quality of workmanship.[3]

Having determined the Glatfelters agreed to obtain the approval of the Association regarding the intended structure and that approval has not been granted, we need not address the remaining issues. Accordingly, we reverse the Commonwealth Court's order reversing the trial court's finding John P. Glatfelter in contempt.[4]

3. To be clear, we are not holding the Glatfelters agreed to abide by the Association's resolution that rejected the recreational cabin exemption. Our holding is premised entirely on the Glatfelters' failure to obtain the Association's approval regarding the intended structure. Accordingly, we need not address the validity of the Association's resolution refusing to adopt the recreational cabin exemption.

4. John P. Glatfelter passed away in 1990; therefore, it is unclear why the trial court entered the order against him. However, neither party addressed this issue; therefore, we will not address it either.

Order reversed.

Jurisdiction relinquished.

Justices McCAFFERY and ORIE MELVIN join the opinion.

Justice SAYLOR files a concurring opinion.

Justice BAER files a concurring opinion in which Chief Justice CASTILLE joins.

Justice TODD files a concurring opinion.

Justice SAYLOR, concurring.

I agree with the lead Justices that there is a difference between infrastructure and aesthetics. *See* Opinion Announcing the Judgment of the Court ("OAJC"), at 568–70, 28 A.3d at 1265–66. I would merely note, however, that some of the concerns raised by Appellant regarding the construction on Appellees' property were of the former type.[1] In any event, here, I believe we are confronted with the different question of what constitutes a "recreational cabin" under the Uniform Construction Code.

In this regard, I support Mr. Justice Baer's position that the conception is ambiguous and should be understood to incorporate rational limits. *See* Concurring Opinion, at 578–83, 28 A.3d at 1271–74 (Baer, J.). Nevertheless, I do not support the hunting-and-fishing nexus which Justice Baer favors, since such language appeared in early bills on the subject, but the Legislature acted to remove it in the political process.[2] In any event, I agree with Appellant (and Justice

1. *See, e.g.,* Supplemental Brief for Appellant at 8 ("The Association voiced numerous concerns with this nascent construction, including concerns regarding the 'unconventional and sub-standard building methods used,' the fact that the poured wall foundation forms had 'blown out' to create an uneven wall structure, and the fact that the foundation walls did not contain proper reinforcement materials and were not thick enough to support a house.").

2. *Compare* H.B. 2149, Printer No. 2896, Gen. Assem., Reg. Sess. (Pa. 2003) (reflecting the proposal to define "recreational cabin" as "[a] structure which is not occupied on a full-time basis and is used mainly by the occupants for the purpose of engaging in seasonal hunting and fishing"), *with* 35 P.S. § 7210.103(1) (defining "recreational cabin," *inter alia,* in terms of principal use for "recreational activity").

Baer) that the recreational-cabin conception should not be applied so broadly as to authorize the construction of a substandard structure in a secondary home planned community. On this point, I believe that divorcing the definition of "recreational cabin" from the mainstream concept of a "cabin"—in terms of both design and location—leads to unreasonable results. It seems to me that the General Assembly's objective was merely to avoid unduly burdening citizens erecting rustic cabins in appropriate venues.

The separate estoppel question, upon which this case may also turn, is one of lesser public importance. This appears to be evidenced by the minimalistic treatment accorded it in the lead opinion (in which the elements of the doctrine are not set forth or discussed). *See* OAJC, at 570, 28 A.3d at 1266. On the other hand, the substantial public importance of the question of what constitutes a recreational cabin is particularly great, in light of the Commonwealth Court's published opinion suggesting a very broad application of the exception. *See Indian Rocks Prop. Owners Ass'n, Inc. of Ledgedale v. Glatfelter,* 950 A.2d 1093, 1099–1100 (Pa.Cmwlth.2008).

Notably, a determination on appellate review may rest on alternative holdings. *See Commonwealth v. Markman,* 591 Pa. 249, 282 & n. 15, 916 A.2d 586, 606 & n. 15 (2007). Thus, I respectfully differ with Madame Justice Todd's suggestion that we should not reach the main issue of public importance here.

Justice BAER, concurring.

Initially, I agree with the Opinion Announcing the Judgment of the Court (OAJC) that the preemption provisions of the Pennsylvania Uniform Construction Code (UCC) "refer to the materials, manner, and methods of construction—the nuts and bolts so to speak—which ensure a structure's safety," and not "the more aesthetic features of a building." OAJC at 569, 28 A.3d at 1265. I further concur with the lead Justices that, to the extent Appellant, the Indian Rocks Property Owners Association, chooses to restrict the outward appearance of the

homes and structures built within the planned community, it may do so without running afoul of the supremacy of the UCC. Thus, I agree that the Association may, in its discretion, reject any building plans submitted to it by the Glatfelters or any other prospective homebuilder on the basis that the plans do not comply with the aesthetic requirements of the Association's Covenants.

To the extent, however, that the OAJC infers that the Association rejected the Glatfelter's proposed structure solely on the basis of aesthetics, *see id.* at 570, 28 A.3d at 1266 ("The Construction Code does not preempt the Association's ability to refuse a structure for other reasons, including the harmony with other structures and, to some degree, the quality of workmanship."), I note that no evidence of record exists to support any suggestion in this regard. Rather, if anything, the record indicates that the Association ultimately rejected any construction by the Glatfelters merely because "no proper paperwork has been submitted to the [Association]." *See* Petition for Contempt filed by the Association at ¶ 12 (Jun. 5, 2007) (found at Reproduced Record (R.R.) 92a). On this point, I tend to agree with the Association that the Glatfelters had failed to submit the "proper paperwork" in order to construct their proposed home.

When the Glatfelters eventually began construction in the fall of 2003, the Association had its own building code, as contained within the Covenants. Under these rules, the original structure failed inspection in December, 2003. On April 24, 2004, the Association incorporated the UCC into the Covenants as the standard for structures built within the planned community. In accord therewith, the Association then filed an action in equity against the Glatfelters in the Wayne County Court of Common Pleas, contending that the proposed home violated both the Covenants and the UCC incorporated therein. This initial suit quickly terminated, as the Association and Glatfelters reached an accord (the April 2004 Settlement), in which the Glatfelters agreed to comply with the UCC and the Covenants.

On July 15, 2004, the General Assembly enacted Act 92 of 2004, which significantly amended the UCC. Relevant hereto, Act 92 implemented the recreational cabin exemption, which, as noted by the lead opinion, permits qualifying structures to be excluded from the stringent mandates of the statute.[1] *See* OAJC at 563–65, 28 A.3d at 1262–63. Despite the broad preemption provisions of the UCC,[2] in April of 2005, the Association passed a resolution, in which it attempted to reject the validity of the recreational cabin exemption in its development.

In July of 2005, the Association again sought court intervention against the Glatfelters, who had still failed to comply with either the Association's Covenants or the April 2004 Settlement. The parties again reached an accord, on July 26, 2005 (the July 2005 Settlement), whereby the Glatfelters agreed, *inter alia*, that:

> The proposed construction must conform with the rules and regulations now in effect at Indian Rocks Property Owners Association, Inc., of Ledgedale.

> The Glatfelters will engage the services of a professional engineer who will be Greenman–Pedersen, Inc., to monitor the construction, and said engineer will certify to the Indian

1. As discussed in greater detail, *infra*, the UCC provides for the uniform standards of construction throughout the Commonwealth. In the same way, the UCC also exempts, statewide, certain buildings from the strict mandates of the code. As referenced by the OAJC, "recreational cabins" are so exempted, provided:
   (i) the cabin is equipped with at least one smoke detector, one fire extinguisher and one carbon monoxide detector in both the kitchen and sleeping quarters; [and]
   (ii) the owner of the cabin files with the municipality either:
   (A) an affidavit on a form prescribed by the department attesting to the fact that the cabin meets the definition of a "recreational cabin" in section [7210.103] or
   (B) a valid proof of insurance for the recreational cabin, written and issued by an insurer authorized to do business in this Commonwealth, stating that the structure meets the definition of a "recreational cabin" as defined in section [7210.103];
   *Id.* § 7210.104(b)(7).

2. Local governments and homeowners' associations are preempted from imposing "building construction standards or codes for buildings to be constructed, renovated, altered or modified." 35 P.S. § 7210.104(d)(2)(i); *see also id.* § 7210.104(d)(1).

Rocks Property Owners Association, Inc., of Ledgedale, that the construction meets the Association rules and regulations, including the UCC, before the next phase of construction may begin.

July 2005 Settlement at ¶¶ 2–3.

The Glatfelters also agreed to submit all necessary paperwork and filing fees to the Association and the local municipality, Salem Township. *Id.* at ¶ 1. Subsequently, the Glatfelters submitted to the Association an approved building permit from Salem Township, which authorized the construction of a "two-story *vacation* home, slab on grade: stick built (recreational cabin exempt)." Salem Township Permit, R.R. at 154a (emphasis added). Thereafter, the Association filed for civil contempt against the Glatfelters, alleging that the building permit was insufficient and, thus, they failed to submit the documentation required by the July 2005 Settlement before resuming construction.

The trial court eventually found for the Association, concluding that the Glatfelters' improperly invoked the recreational cabin exemption. The trial court reasoned that, when the Glatfelters entered into the April 2004 Settlement, agreeing to construct the home in accordance with the Association's Covenants, the recreational cabin exemption had not yet been enacted by the General Assembly as part of the UCC. In other words, the Glatfelters had to abide by the law as it existed in 2004, and, therefore could not invoke the recreational cabin exemption to avoid the April 2004 Settlement.

As noted by the OAJC, the Commonwealth Court reversed this ruling, finding for the Glatfelters and reasoning as follows: (1) the July 2005 Settlement controlled; (2) under the preemption provisions of the UCC, the Association could not opt out of the recreational cabin exemption; and (3) as the UCC was part of the Covenants, and the Glatfelters agreed to act in conformity with the Covenants in the July 2005 Settlement, they were free to invoke the recreational cabin exemption and to build their vacation home in accord therewith. Initially, I agree with the Commonwealth Court that the trial

court erred in focusing on the April 2004 Settlement, rather than the July 2005 Settlement. "Settlement agreements are governed by contract law principles." *Lesko v. Frankford Hospital–Bucks County,* 15 A.3d 337, 341–42 (Pa.2011). One of those well established principles states, "[a] new agreement will supersede the old so far as they cannot be executed together." *Robert Grace Contracting Co. v. Norfolk & W. Ry. Co.,* 259 Pa. 241, 102 A. 956, 957 (1918). Viewing these two settlements in light of the history of this case, one may only conclude that the parties reached an agreement in April of 2004, the Glatfelters breached that agreement, the Association filed suit, and a new settlement was reached in July of 2005, which took the place of the April 2004 Settlement. Indeed, the July 2005 Settlement specifically stated that the Glatfelters were to abide by the Association's "rules and regulations now in effect." July 2005 Settlement at ¶ 2. Further, neither before the Commonwealth Court nor this Court has either party contended that the April 2004 Settlement controls the instant appeal.

Premised upon the conclusion that the July 2005 Settlement governs this case, I turn to the Association's contention that under the terms of the settlement: (1) the Glatfelters were required to construct their home in accordance with the Covenants as they existed at that time; and (2) the Covenants prohibited the construction of recreational cabins notwithstanding their authorization under the UCC. Put succinctly, the Association contends that the Glatfelters are equitably estopped from invoking the recreational cabin exemption because they agreed not to do so in the July 2005 Settlement. In response, the Glatfelters argue that because the UCC supersedes all conflicting regulations by homeowners' associations, *see* 35 P.S. § 7210.104(d)(2)(i), the Association could not except itself out of the recreational cabin exemption. Therefore, contends the Glatfelters, they could construct a recreational cabin and still comply with the July 2005 Settlement.

While a strong argument can be made that the UCC preempts the Association's resolution regarding the recreational cabin exemption, notwithstanding the Glatfelters' at-

tempt to inject the issue into this case, it simply is not before this Court. Rather, this case is about a private agreement reached between two parties, which mandated that the Glatfelters' "proposed construction must conform with the rules and regulations now [July 2005] in effect at Indian Rocks Property Owners Association, Inc., of Ledgedale." July 2005 Settlement at ¶ 2.[3] While there is no disagreement that the Glatfelters so promised, the pertinent issue is whether that promise equitably estops them from arguing otherwise at this juncture.

Equitable estoppel is a doctrine that prevents one from doing an act differently than the manner in which another was induced by word or deed to expect. A doctrine sounding in equity, equitable estoppel recognizes that an informal promise implied by one's words, deeds or representations which leads another to rely justifiably thereon to his own injury or detriment, may be enforced in equity.

*Novelty Knitting Mills, Inc. v. Siskind,* 500 Pa. 432, 457 A.2d 502, 503 (1983).

It is reasonable to conclude that the Association settled its lawsuit against the Glatfelters in justifiable reliance upon their agreement to conform to the rules and regulations of the Association in effect in July, 2005, which prohibited the building of a recreational cabin. The Glatfelters expressly acquiesced to this consideration in exchange for the termination of the Association lawsuit. Thus, I conclude that the doctrine of equitable estoppel is applicable, and thereunder the Glatfelters are precluded from constructing an argument to avoid the settlement agreement, and thereby the covenants of the Association, which plainly preludes the construction of a recreational cabin. On this basis alone, I am able to join the conclusion that the Commonwealth Court should be reversed, and judgment should be entered for the Association.

Even assuming, *arguendo,* that the Glatfelters were not equitably estopped from asserting the recreational cabin exemption, on the merits, I do not believe the structure they

3. On this point, I note my disagreement with the lead Justices that "resolution of this issue requires us to interpret the breadth of the [UCC's] preemption clause. OAJC at 1265.

desire to build meets the definition of a recreational cabin. A recreational cabin is defined in Section 7210.103 of the UCC as a structure which is:

(1) utilized principally for recreational activity;

(2) not utilized as a domicile or residence for any individual for any time period;

(3) not utilized for commercial purposes;

(4) not greater than two stories in height, excluding basement;

(5) not utilized by the owner or any other person as a place of employment;

(6) not a mailing address for bills and correspondence; and

(7) not listed as an individual's place of residence on a tax return, driver's license, car registration or voter registration.

35 P.S. § 7210.103.

The parties do not dispute that the Glatfelters' proposed recreational cabin is a two-story structure of approximately 1,700 square feet, with eight rooms, two bathrooms, and an attached garage. Such facts emphasize the question: if the Glatfelters can build this "cabin" in a planned community in the Poconos, why cannot anyone construct any structure, anywhere, of any size or elaborateness, so long as it is two-stories, used principally for a "recreational activity," and meets the other rather innocuous requirements of Section 7210.103? In other words, if all that is proposed is a two-story secondary residence (thus satisfying clauses (2) through (7) of Section 7210.103), then all a person need do is certify that the home will be "utilized primarily for recreational activity" to qualify for the exemption.

"Recreation" can mean any number of things, and is broadly defined as "refreshment of one's mind or body after work through an amusing or stimulating activity: play." Webster's II New College Dictionary at 927 (2001). Similarly, "vacation" is defined as "a period of time for pleasure, rest, or relax-

ation. . . ." *Id.* at 1217.[4]  Of course, we all recreate or enjoy vacation in different ways: napping, reading a book, online shopping, playing sports, or simply walking.

In accord with the specific statutory language, the General Assembly passed the UCC to protect "life, health, property and [the] environment," and also to ensure the protection of "the safety and welfare of the consumer, general public and the owners and occupants of buildings and structures." 35 P.S. § 7210.102(b)(1).  If this Court were to hold that the proposed building was a recreational cabin exempt from the UCC solely because clauses (2) through (7) of Section 7210.103, quoted above, are met and any conceivable "recreational activity" could occur therein, this exception would swallow the rule, and the purpose of the UCC would be vitiated.  As already stated, the General Assembly enacted the UCC to standardize uniform benchmarks applicable to the construction of all buildings, with very few exceptions, throughout the Commonwealth.  Any interpretation nullifying that goal should be rejected as inconsistent with the legislature's stated intent.  Thus, it falls to this Court to provide a meaningful definition, consonant with the General Assembly's intent in passing the UCC, for the ambiguous phrase "recreational activity."

Upon determining that a statutory provision is ambiguous, this Court is guided by the rules of statutory construction. These well-established rules provide:

(1) The occasion and necessity of the statute.

(2) The circumstances under which it was enacted.

(3) The mischief to be remedied.

(4) The object to be attained.

\*     \*     \*

(6) The consequences of a particular interpretation.

---

4. While "recreation" is the pertinent word insofar as this analysis is concerned, I also note the definition of "vacation," as the Glatfelters obtained a building permit from Salem Township for a "two-story vacation home, slab on grade: stick built (recreational cabin exempt)." Salem Township Permit, R.R. at 154a.

(7) The contemporaneous legislative history.

\*       \*       \*

1 Pa.C.S. § 1921(c). Moreover, we should presume "[t]hat the General Assembly does not intend a result that is absurd or unreasonable," and "[t]hat the General Assembly intends to favor the public interest as against any private interest." *Id.* § 1922(1) & (5). Finally, reports and comments available to the General Assembly at the time of final passage may be used to construe the statute. *Id.* § 1939.

In order to analyze the recreational cabin exemption under these tenets, a general background to the UCC is first necessary. Over staunch opposition, in 1999 the General Assembly adopted the model code of the Building Officials and Code Administrators International as Pennsylvania's Uniform Construction Code. In enacting the UCC, the legislature found that such a model code was necessary to provide this Commonwealth with uniform and modern construction standards, in order to correct the problem of multiple municipalities within the Commonwealth having "no construction codes to provide for the protection of life, health, property and the environment and for the safety and welfare of the consumer, general public, and the owners and occupants of buildings and structures." 35 P.S. § 7210.102(a)(1). In furtherance of these findings, the General Assembly explicitly established that the purposes of the Act were:

(1) To provide standards for the protection of life, health, property and environment and for the safety and welfare of the consumer, general public and the owners and occupants of buildings and structures.

(2) To encourage standardization and economy in construction by providing requirements for construction and construction materials consistent with nationally recognized standards. [and]

(3) To permit to the fullest extent feasible the use of state-of-the-art technical methods, devices and improvements consistent with reasonable requirements for the health, safety

and welfare of occupants or users of buildings and structures.

*Id.* § 7210.102(b)(1)-(3).

Between the date of its passage in 1999 and 2004, all buildings and structures within the Commonwealth, without regard for complexity or simplicity of design, fell under the auspices of the UCC. House Bill 2149 of 2003 was then introduced to attempt to alleviate some of the strictness of the UCC, including abolishing many of the requirements it imposed upon persons making small repairs to homes. Importantly to the discussion at hand, the bill also included what has now become known as the recreational cabin exemption. However, in HB 2149, a recreational cabin was defined as, *inter alia,* "a structure used principally for the purpose of engaging in seasonal hunting and fishing." [5] HB 2149, however, while passed by the House, was never acted upon in the Senate.

Two months after HB 2149 "died," Senate Bill 1139 of 2004 was introduced, also for the purpose (among other things) of adding a recreational cabin exemption to the UCC. Relevant to this appeal, however, one major difference existed: the definition of a recreational cabin changed from that "used principally for the purpose of engaging in seasonal hunting and fishing" to "utilized principally for recreational activities." The Senate journal contains no reasoning regarding the definitional change.[6]

5. As proposed in HB 2149, a recreational cabin was defined as a structure which is:
   (1) used principally for the purpose of engaging in seasonal hunting and fishing;
   (2) not utilized as a domicile or residence for any individual for any time period;
   (3) not utilized for commercial purposes;
   (4) not greater than two stories in height, excluding basement;
   (5) not utilized by the owner or any other person as a place of employment;
   (6) not a mailing address for bills and correspondence; and
   (7) not listed as an individual's place of residence on a tax return, driver's license, car registration or voter registration.

6. Contrarily, the legislative history for HB 2149 contains justification for the definition of a recreational cabin. *See* Pennsylvania House of

It appears, however, that the "seasonal hunting and fishing" concept survived. In the Bill Summary for SB 1139, prepared on July 2, 2004 (the day after the House of Representatives passed an amended version of SB 1139, but prior to the Senate's final passage of the bill), recreational cabins were defined consistent with the HB 2149 definition: "used principally for the purpose of engaging in seasonal hunting and fishing." Further, the Bill Summary stated that the exemption was necessary because enforcement of the UCC in the backwoods of rural counties is almost impossible, and the "sportsmen who utilize hunting/fishing cabins are not concerned about the standardization/quality of construction and, in fact, are responsible citizens that accept rustic conditions." House of Representatives Bill Summary, SB 1139, at 3 (Jul. 2, 2004) (Bill Summary). The legislature passed SB 1139 on July 4, 2004, and it became Act 92 of 2004. With this background, it should follow that the General Assembly intended the term "recreational activity" in Act 92 to encompass seasonal hunting, fishing, and like activities.[7]

Moreover, the common use definition of a cabin is a structure which is "small [and] roughly constructed." Webster's II New College Dictionary at 153 (2001). While that definition seemingly contradicts the above-stated, generalized goals of the UCC, it is completely consistent with the foregoing discussion: the General Assembly specifically intended to exempt, statewide, from the strict and rigid mandates of the UCC

Representatives Legislative Journal, 2004 Session, No. 19, at 464–467 (Mar. 31, 2004) (remarks of Rep. Fairchild, noting the safety provisions contained within the recreational cabin exemption).

7. While I realize that the Bill Summary is inconsistent with the final, enacted language of SB 1139/Act 92, it is the only evidence available that allows this Court to consider "the occasion and necessity of the statute; the circumstances under which it was enacted; the mischief to be remedied; [and] the object to be attained." 1 Pa.C.S. § 1921(c)(1)-(4). The explicit language of the summary makes clear that the recreational cabin exemption was found necessary by the General Assembly because enforcement of the strict provisions of the UCC was virtually impossible in extreme rural areas, and, indeed, made little sense in that context. In its wisdom, the legislature found that, so long as certain other requirements were met, the Commonwealth should not impose the rigid mandates of the UCC on the rustic sportsman who may not be anxious about substandard construction.

"small, roughly constructed" buildings; in other words, structures intended for "sportsmen who are ... not concerned about standardization/quality of construction and, in fact, are responsible citizens that accept rustic conditions." Bill Summary at 3. To accept, on the other hand, that the General Assembly chose to exclude structures like the one proposed by the Glatfelters—1,700 square feet, eight rooms, an attached garage, and situated on a lake—from the UCC would lead, as stated, to an unreasonable, and absurd result, *see* 1 Pa.C.S. § 1922(1), and would disfavor the public interest of safety and welfare against any private interest. *Id.* § 1922(5).

Thus, I would hold that the Glatfelters, through the July 2005 Settlement, are equitably estopped from now invoking the recreational cabin exemption in order to construct their proposed home outside the mandates of the Covenants or the UCC. Moreover, even if recreational cabin exemption would apply instantly, consistent with the statutory interpretation analysis above, in my view, the Glatfelters have not proposed to construct a recreational cabin. As I agree with the OAJC that the contempt citation should be reinstated, I concur in its result, for all the reasons set forth herein.

Justice TODD, concurring.

I join the Concurring Opinion of my colleague, Justice Baer, with one exception. Given his estoppel analysis, it is unnecessary, in my view, to address the recreational cabin exemption. Therefore, I do not join the portion of his Concurring Opinion discussing that exemption. *See* Concurring Opinion (Baer, J.) at 577–83, 28 A.3d at 1270–74.